## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND SEARCH WARRANT

I, Special Agent Galen Doud, Drug Enforcement Administration, being duly sworn, depose and state as follows:

### Agent Background

1.      I am a Special Agent with the United States Drug Enforcement Administration ("DEA") and have been so employed since May 2017. I am presently assigned to the Manchester, New Hampshire District Office. I am a "federal law enforcement officer" as defined in Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure, that is, a government agent who is engaged in enforcing the criminal laws of the United States and within a category of officers authorized by the Attorney General to request a search warrant.

2.      While attending the DEA Training Academy, I received training on numerous topics pertaining to drug investigations. My primary duties as a DEA Special Agent include investigating federal crimes and violations of the Controlled Substances Act at the local, national, and international level.  I am also a member of DEA's Special Response Team as well as DEA's Clandestine Laboratory Enforcement Team.

3.      Prior to being employed as a DEA Special Agent, I was employed as a full-time police officer with the City of Nashua, New Hampshire Police Department for approximately four-and-one-half years. I made several hundred arrests and initiated, conducted, and assisted in numerous criminal investigations, many of which involved drug violations. I worked as a police officer in a uniformed and plain-clothed capacity, and debriefed numerous defendants and cultivated many sources of information and confidential sources pertaining to drug trafficking organizations. I have also attended multiple trainings about drug-related investigations and

relevant topics associated with drug investigations. I have a Bachelor of Science degree in Criminal Justice from Northeastern University.

4.      I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations. I have also reviewed recorded conversations and telephone, financial, and drug records. Through my training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs. I have also become familiar with the manner in which narcotics organizations utilize various forms of violence and intimidation in furtherance of their narcotics trafficking activity, and to protect their operations, members, narcotics, and narcotics proceeds.

5.      Based on my training and experience, I am aware that drug traffickers commonly use cellular telephones to communicate about and further their drug trafficking activities, but are aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and cellular telephones, use multiple cellular telephones simultaneously, use prepaid cellular telephones (where the subscriber of the phone is not required to provide personal identifying information), and use encrypted messaging applications like WhatsApp, Signal, and Telegram, in an effort to thwart law enforcement's use of electronic surveillance. I am also aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to prevent detection, and often use text messages in lieu of phone calls to avoid speaking over the telephone.

2

## **Purposes of the Affidavit**

6.      I submit this affidavit in support of an application for a criminal complaint charging Thomas GYNAN with four counts of distribution and possession with intent to distribute controlled substances, that is methamphetamine, in violation of Title 21, United States Code, Section 841 (the "Charged Offenses").  Based on the facts set forth in this affidavit, there is probable cause to believe that GYNAN has committed the Charged Offenses.

7.      In addition to the Charged Offenses, I have been investigating GYNAN for conspiracy to distribute and to possess with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 846; possession of a firearm in furtherance of drug trafficking, in violation of Title 18, United States Code, Section 924(c); felon in possession of a firearm, in violation of Title 18, United States Code, Section 922(g), and unlawful possession and transfer of a machinegun, in violation of Title 18, United States Code, Section 922(o).  These crimes and the Charged Offenses constitute the "Target Offenses."

8.      I also submit this affidavit in support of an application for a search warrant for the following premises and the cellular phones located therein for fruits and instrumentalities of the Target Offenses, described more fully in Attachment B:

> a.  Target Location 1:  8 Rowell Court, Amesbury, Massachusetts.  Target Location 1 is further described in Attachment A.

9.      As a result of my personal participation in the investigation, review of reports submitted by other law enforcement personnel, and my consultations with other law enforcement officers, I am familiar with this investigation.  The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  I submit this affidavit for the limited purpose of establishing probable cause for the

3

requested criminal complaint and warrant.  Accordingly, I have not included each and every fact known to me and other law enforcement officers involved in this investigation.

## Probable Cause

### *Investigation Background*

10.     In October 2024, investigators met a confidential source for the government (the "CS")[1] who informed investigators that GYNAN was involved in drug and firearm dealing.  The CS stated that GYNAN's phone number was 978-715-7321 (the "7321 Phone").  The CS had known GYNAN for approximately six months.  The CS stated that GYNAN was a crack cocaine user and that GYNAN carried a pistol on his person.  The CS identified GYNAN's residence as the far-left end unit on Feeley Terrace in Amesbury, Massachusetts.  Based on this description, investigators identified GYNAN's residence as Target Location 1.  The CS stated that the CS had been inside GYNAN's residence and that GYNAN maintained surveillance cameras around his residence and had a safe in an upstairs room.  The CS stated that the CS had observed GYNAN open the safe and had observed large amounts of U.S. currency and drugs inside the safe.

11.     The CS stated that the CS had purchased methamphetamine from GYNAN approximately 12 times over the prior six months.  The CS stated that GYNAN sold an ounce of methamphetamine for $200, one quarter-pound for $750, and one half pound for $1,400.  The CS

---

[1] The CS originally began cooperating with investigators after being arrested for controlled substances offenses. The CS was originally cooperating in hopes of receiving dismissals of the drug charges.  The charges were eventually dismissed based on the CS's cooperation.  The CS is now receiving financial compensation for the CS's assistance. The CS has a criminal history that includes arrests and convictions for numerous controlled substances offenses, falsifying physical evidence, assault, threatening, unlicensed carrying of a firearm, felon in possession of a firearm, parole violations, and theft, among other crimes.  Information provided by the CS has led to the identification of narcotics traffickers and the seizure of narcotics.  The information provided by the CS has been corroborated to the extent possible and is believed to be reliable. The CS is willing to testify.

stated that the CS observed GYNAN with approximately 15 pounds of methamphetamine a few weeks prior to meeting with investigators. The CS added that the CS had seen GYNAN with a "full auto" rifle and multiple pistols. The CS further stated GYNAN had offered to sell the CS the rifle for $2,500.

12.    The CS stated that the CS communicates with GYNAN via the encrypted application Signal and provided GYNAN's Signal profile name of "Timmy Savinhill." Based on experience and training, investigators know that Signal is a communication application which uses end-to-end encryption, similar to WhatsApp or Telegram. Investigators further believe that drug traffickers commonly use these types of end-to-end encrypted applications to shield their communications from law enforcement detection. While the CS was meeting with investigators, the CS received a Signal call from GYNAN and investigators heard the CS speak with a male, whom the CS later identified as GYNAN. GYNAN and the CS discussed the "metal thing" and the "frozen thing." After the call, the CS stated that the "metal thing" was a reference to the rifle, and the "frozen thing" was a reference to methamphetamine, both of which GYNAN was offering to sell to the CS.

13.    After receiving this information from the CS regarding GYNAN, investigators searched law enforcement databases and Massachusetts Registry of Motor Vehicle ("RMV") records. RMV records showed that GYNAN holds a Massachusetts driver's license and that his residence is listed as Target Location 1. Additionally, GYNAN has registered a 2014 black Ford Focus to Target Location 1. Finally, T-Mobile records showed that GYNAN is the subscriber for the 7321 Phone with Target Location 1 listed as the account holder address. Based on experience and training, the CS's information about GYNAN's residence, the records described above, and GYNAN's activities in and around Target Location 1 described below, investigators believe that

Target Location 1 is GYNAN's residence.[2]

*On December 9, 2024, GYNAN Sold 105 Grams of*
*Methamphetamine to the CS Inside Target Location 1.*

14.    In the days leading up to December 9, 2024, at investigators' direction, the CS exchanged Signal messages with GYNAN to set up the purchase of methamphetamine. These messages are preserved.[3]  In lightly coded language, GYNAN agreed to sell the CS a quarter-pound of methamphetamine for $1,000.  In an unrecorded voice conversation, GYNAN stated to the CS that he was having difficulty obtaining methamphetamine from his regular supplier. Because of those difficulties, GYNAN was having a difficult time obtaining large quantities of methamphetamine and the prices for methamphetamine had increased.  GYNAN told the CS to meet him at Target Location 1 for the methamphetamine deal.

15.    On December 9, 2024, investigators met with the CS at a predetermined location. Investigators searched the CS and the CS's vehicle for contraband and currency with negative results. The CS confirmed with investigators that the CS communicated with GYNAN over Signal to set up the methamphetamine deal.  Investigators have reviewed these messages.

16.    Investigators equipped the CS with an audio/video recording and transmitting device and provided him with $1,000 of Official Advanced Funds ("OAF") to purchase the methamphetamine.  At this time, at investigators' direction, the CS, over Signal, informed GYNAN that the CS was in the area of Target Location 1 and was ready to meet to conduct the

---

[2] GYNAN has a criminal history including arrests for assault and battery and multiple controlled substances offenses.

[3] The text messages over Signal between the CS and GYNAN have been preserved and investigators have reviewed those messages.  Several times, outside the presence of investigators, the CS had voice calls over Signal with GYNAN.  These calls have not been recorded.

drug deal.

17.     While the CS was communicating with GYNAN in the presence of investigators, other investigators placed surveillance around Target Location 1 and observed GYNAN's Ford Focus and two other vehicles bearing New Hampshire registration parked near Target Location 1.

18.     At approximately 12:30 p.m., investigators surveilled the CS as the CS drove to Target Location 1. Once the CS arrived, the CS exited the CS's vehicle and approached the outer door to Target Location 1. Investigators observed a white male let the CS inside Target Location 1. Inside Target Location 1, GYNAN handed the CS a crystalline substance wrapped in a clear plastic bag believed to be methamphetamine. The CS provided the OAF to GYNAN. The CS and GYNAN discussed a previous drug debt that the CS owed GYNAN. The $1,000 in OAF covered both the purchased quarter-pound of methamphetamine and a prior purchase by the CS. The CS observed several other individuals inside Target Location 1. The CS believes that GYNAN also has a roommate who lives in Target Location 1. Investigators have not been able to confirm the identify or existence of this roommate. The CS also observed that GYNAN had a pistol on his hip during the drug deal. Investigators were not able to confirm the presence of the pistol through review of the recording because the video was obscured during the meeting.

19.     At approximately 12:55 p.m., investigators observed GYNAN escort the CS to the outer door to Target Location 1. After separating from GYNAN, the CS exited Target Location 1 and returned to the CS's vehicle. Investigators surveilled the CS as the CS drove back to the predetermined location. Once at the predetermined location, the CS met with investigators. The CS provided the suspected methamphetamine in the plastic bag to investigators. Investigators searched the CS's person and vehicle for contraband and currency with negative results.

20.     The crystalline substance was sent to the DEA laboratory for testing. Laboratory

results confirmed the presence of methamphetamine, 100% pure, with a weight of 105 grams.

*On December 17, 2024, GYNAN Sold 28 Grams of*
*Methamphetamine to the CS Inside Target Location 1.*

21.    In the days leading up to December 17, 2024, at investigators' direction, the CS exchanged Signal messages with GYNAN to set up another purchase of methamphetamine. These messages are preserved. In lightly coded language, GYNAN informed the CS that GYNAN had only one ounce to sell to the CS. GYNAN agreed to sell the CS an ounce of methamphetamine for $300. GYNAN and the CS had previously discussed GYNAN's possession of a fully automatic rifle. When the CS asked GYNAN about the status of that rifle, GYNAN had told the CS that it was "put away" and that GYNAN would only bring it out to sell it. These communications have been preserved.

22.    On December 17, 2024, investigators met with the CS at a predetermined location. Investigators searched the CS and the CS's vehicle for contraband and currency. Investigators secured two small pocket knives and $15 from the CS and held them during the controlled purchase. At approximately 1:29 p.m., while still meeting with investigators, the CS received a phone call over Signal. Investigators heard the male voice and the CS confirmed it was GYNAN. The CS told GYNAN that the CS would meet GYNAN in approximately 10 to 15 minutes.

23.    Investigators equipped the CS with an audio/video recording and transmitting device and provided him with $300 of OAF to purchase the methamphetamine. At approximately 1:44 p.m., investigators surveilled the CS as the CS drove to Target Location 1. At approximately 1:49 p.m., the CS arrived in the vicinity of Target Location 1. Through the use of a video surveillance and physical surveillance, investigators observed several people in the rear deck area outside Target Location 1. At approximately 1:51 p.m., an individual let the CS inside Target

Location 1.

24.     Once inside Target Location 1, the CS met with GYNAN.  There were multiple other individuals inside Target Location 1 and outside in the rear deck area.  GYNAN tossed a clear plastic bag of suspected methamphetamine to the CS and the CS provided GYNAN with the $300 of OAF.  GYNAN and the CS discussed the rifle mentioned above.  The CS asked GYNAN what about the lowest price GYNAN would accept for the rifle.  GYNAN stated that the price for the rifle was $2,000.  GYNAN also stated that he would "re-up" the next day, which the CS and investigators understood to mean that GYNAN would be obtaining more methamphetamine from his supplier.  The CS observed a handgun on GYNAN's hip and asked about the gun.  GYNAN pulled the gun out of his waistband, removed the magazine, and pulled the slide back.  GYNAN then handed the handgun to the CS for the CS's inspection.  Based on the angle of the video camera, investigators could see the CS handing the gun back to GYNAN, but could not see GYNAN handling the gun prior to giving it to the CS.  The handgun had a silver slide and a black handle.  GYNAN stated that he had not yet fired this handgun and that he did not want to sell it yet.

25.     When reviewing the recording of this meeting, investigators were also able to see a video camera mounted on a wall inside Target Location 1.  Based on the CS's prior observations of surveillance cameras inside Target Location 1 and this video recording of the suspected surveillance camera, investigators believe that GYNAN maintains surveillance footage from inside Target Location 1.  Based on experience and training, investigators know that drug traffickers commonly maintain surveillance cameras on the inside and outside of their residences to deter theft by other drug traffickers and to detect law enforcement presence.

26.     While inside Target Location 1, one of the other men inside the residence who was

9

introduced to the CS as "Spanky," discussed purchasing a quantity of methamphetamine from GYNAN. The CS and GYNAN also discussed future purchases of methamphetamine. The CS stated that GYNAN, "Spanky," and others appeared to be smoking crack cocaine and that the CS observed what appeared to be an "eight-ball" or 3.5 grams of crack cocaine on the coffee table inside Target Location 1. At approximately 2:05 p.m., GYNAN stated that it "was time," and that everyone had to leave, which the CS understood to mean that GYNAN was going to "re-up" on methamphetamine.

27.    A short time later, the CS exited Target Location 1. At approximately 2:10 p.m., investigators surveilled the CS drive back to the predetermined location. Once at the predetermined location, the CS met with investigators. The CS provided the suspected methamphetamine in the plastic bag to investigators. Investigators searched the CS's person and vehicle for contraband and currency with negative results.

28.    The crystalline substance was sent to the DEA laboratory for testing. Laboratory results confirmed the presence of methamphetamine, 99% pure, with a weight of 28 grams.

*On January 3, 2025, GYNAN Sold Approximately 147 Grams of Suspected Methamphetamine to the CS Inside Target Location 1.*

29.    In the days leading up to January 3, 2025, at investigators' direction, the CS exchanged Signal messages with GYNAN to set up another purchase of methamphetamine. These messages are preserved. In lightly coded language, GYNAN informed the CS that GYNAN would sell the CS one half-pound of methamphetamine on January 3, 2025 for $2,000. Like the previous methamphetamine deals, this sale was set to take place at GYNAN's residence, Target Location 1.

30.    On January 3, 2025, investigators met with the CS at a predetermined location.

Investigators searched the CS and the CS's vehicle for contraband and currency. Investigators secured one small pocket knife and $165 from the CS and held them during the controlled purchase. Investigators equipped the CS with an audio/video recording and transmitting device and provided him with $2,000 of OAF to purchase the methamphetamine. Investigators also established physical surveillance around Target Location 1 and continued to monitor the location through video surveillance.

31.     At approximately 12:16 p.m., investigators surveilled the CS as the CS drove to Target Location 1. At approximately 12:18 p.m., investigators observed "Spanky" and another male arrive in the area of Target Location 1 in separate vehicles. At approximately 12:20 p.m., the CS arrived in the vicinity of Target Location 1. The CS called GYNAN through the Signal application and let GYNAN know that the CS had arrived at Target Location 1. Another male then let the CS inside Target Location 1. The CS met with GYNAN inside Target Location 1. The CS observed a pistol in a holster on GYNAN's hip. Based on the angle of the video camera, investigators could not observe the gun on GYNAN's hip in the video recording. The CS then gave GYNAN the $2,000. GYNAN handed the CS a plastic bag containing the suspected methamphetamine.

32.     There were multiple people inside Target Location 1 during this meeting. The CS and GYNAN discussed the sale of the rifle and GYNAN stated he had two magazines for the rifle, but then said he only had one. GYNAN stated that he had no ammunition for the rifle. The CS and GYNAN also discussed the sale of methamphetamine and GYNAN stated that he would sell a pound of methamphetamine for at least "2," meaning $2,000. Another individual inside Target Location 1 was upset by this price and recounted that GYNAN had told him that a pound of methamphetamine was actually $2,500. Investigators could hear GYNAN speaking with the CS

11

through the recording device at this time.  The CS discussed the automatic rifle with GYNAN.
Investigators also heard GYNAN refer to the sale of "p's" for "2."  Based on experience and
training, the CS and investigators understood GYNAN to be referring to the sale of pounds of
methamphetamine for $2,000.  However, based on the previously quoted price of $2,000 for a half-
pound of methamphetamine, the CS and investigators believed GYNAN regularly changed his
prices for methamphetamine based on supply availability.

33.    At approximately 12:34 p.m., the CS exited Target Location 1.  Investigators
surveilled the CS drive back to the predetermined location.  Once at the predetermined location,
the CS met with investigators.  The CS provided the suspected methamphetamine in the plastic
bag to investigators.  Investigators searched the CS's person and vehicle for contraband and
currency with negative results.  The plastic bag contained a crystalline substance with the number
"147" written on the bag.  The bag with packaging weighed approximately 182 grams, which is
well short of the half-pound of methamphetamine that GYNAN had agreed to sell the CS.  At
investigators' direction, the CS reached out to GYNAN about the discrepancy.  GYNAN told the
CS that GYNAN had given him the wrong bag and apologized.

34.    The crystalline substance was sent to the DEA laboratory for testing.  Laboratory
results are pending.  Investigators conducted a field test of the substance which showed the
presence of methamphetamine.  Based on the positive field test, the physical appearance of the
crystalline substance, the discussions with GYNAN, and the prior confirmed methamphetamine
purchases, investigators believe the substance to be methamphetamine.

*On January 8, 2025, GYNAN Sold Approximately 14 Grams of Suspected*
*Methamphetamine and an Automatic Rifle to the CS Inside Target Location 1.*

35.    In the days leading up to January 8, 2025, at investigators' direction, the CS

12

exchanged Signal messages with GYNAN to set up another purchase of methamphetamine and a purchase of the automatic rifle. These messages are preserved. In lightly coded language, GYNAN confirmed that he would sell the automatic rifle to the CS for $2,000 and that he would provide additional methamphetamine to make up for the discrepancy in methamphetamine weight described above. Like the previous methamphetamine deals, this rifle and methamphetamine sale was set to take place at GYNAN's residence, Target Location 1.

36.    On January 8, 2025, investigators met with the CS at a predetermined location. Investigators searched the CS and the CS's vehicle for contraband and currency. Investigators secured one small knife and $40 from the CS and held them during the controlled purchase. Investigators equipped the CS with an audio/video recording and transmitting device and provided him with $2,000 of OAF to purchase the rifle. Investigators also established physical surveillance around Target Location 1 and continued to monitor the location through video surveillance. Investigators observed numerous individuals, including GYNAN, entering and exiting from Target Location 1 in the time period leading up to the controlled sale.

37.    At approximately 3:01 p.m., GYNAN called the CS through Signal and told the CS to come to his house in approximately five minutes. At approximately 3:06 p.m., investigators surveilled the CS as the CS drove to Target Location 1. At approximately 3:07 p.m., investigators observed GYNAN re-enter Target Location 1 carrying a brown laundry hamper. At approximately 3:10 p.m., the CS arrived in the vicinity of Target Location 1. GYNAN then called the CS through Signal and told the CS to come inside the residence. At approximately 3:13 p.m., the CS entered Target Location 1. The CS met with GYNAN inside Target Location 1.

38.    Once inside Target Location 1, GYNAN offered the CS crack cocaine and the CS declined. GYNAN then indicated that he needed to check to see if the CS was wearing a wire.

13

The CS removed the CS's jacket and GYNAN waved what appeared to be a metal detecting wand over the CS which returned negative results. GYNAN then provided the CS with a plastic bag containing suspected methamphetamine. GYNAN went upstairs and came back downstairs with a tan hamper from which he pulled out a rifle and one magazine. Through the video recording, investigators could observe GYNAN handle the rifle. The CS then gave GYNAN the $2,000 of OAF for the rifle. The CS then took possession of the rifle. GYNAN discussed receiving methamphetamine through the mail. GYNAN also stated that his "boy" was picking up a "Sig," referring to a Sig Sauer firearm. Through the recording device, investigators could hear GYNAN question the CS about whether the CS was wearing a wire. Then GYNAN discussed getting "it" in the mail five to ten at a time. Based on experience and training, investigators believed GYNAN was referring receiving five to ten pounds of methamphetamine through the mail.

39.    At approximately 3:37 p.m., the CS exited Target Location 1. Investigators surveilled the CS drive back to the predetermined location. Once at the predetermined location, the CS met with investigators. The CS provided the suspected methamphetamine in the plastic bag to investigators. The CS also provided the rifle and magazine to investigators. Investigators searched the CS's person and vehicle for contraband and currency with negative results. The plastic bag contained a crystalline substance inside. The bag appeared to contain approximately on half-ounce or 14 grams of methamphetamine.

40.    The crystalline substance was sent to the DEA laboratory for testing. Laboratory results are pending. Investigators conducted a field test of the substance which showed the presence of methamphetamine. Based on the positive field test, the physical appearance of the crystalline substance, the discussions with GYNAN, and the prior confirmed methamphetamine

14

purchases, investigators believe the substance to be methamphetamine.

41.     Investigators identified the rifle as a Polish military, model PPS-43, 7.62x25mm, sub-machinegun, bearing serial number "KM-02882." Investigators from the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") conducted a visual examination of the PPS-43 and believe, based on that preliminary visual inspection, that the PPS-43 is a fully automatic rifle.

### Drug Traffickers' and Firearms Traffickers Use of Residences and Cell Phones Generally

42.     Based upon my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at the residences of drug and firearms traffickers, I am aware that the following kinds of drug- and firearm-related evidence have typically been recovered during searches of the traffickers' residences. Additionally, based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that the items listed below related to firearms are durable and are generally kept at the residence of individuals involved in the illegal use and possession of firearms. Such individuals will keep firearms, firearm parts, and tools to manufacture firearms for long periods of time. Further, such individuals keep records of their firearm dealing, such as contact information of sources/suppliers and customers in their residence.

    a.     Controlled substances and materials used to "cut" or dilute those substances;

    b.     Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, including but not limited to, plastic bags, heat-sealing devices, scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, and substances used to "cut" or dilute illegal narcotics;

    c.     Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances. Such documents include, but are not limited to, prescriptions, ledgers, text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds, bank records, money orders, wire transfers, cashier's checks, checkbooks, passbooks, certificates of deposit, vehicle rental receipts,

credit card receipts, and receipts reflecting rental properties and/or storage units;

d.      Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers.  Such documents include, but are not limited to, telephone address books, planners, notes, ledgers, and telephone bills;

e.      Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances.  Such items include, but are not limited to, jewelry, precious metals such as gold and silver, precious gems such as diamonds, titles, deeds, monetary notes, registrations, purchase or sales invoices, and bank records;

f.      Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as    motor    vehicles,    real    property,    and    commercial    storage    facilities;

g.      Labels for overnight deliveries and Express Mail deliveries, receipts and other documents pertaining to such shipments;

h.      Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys;

i.      Photographs, videos, or other records concerning controlled substances, proceeds from    the    sales    of    controlled    substances,    or    identities    of    coconspirators;

j.      Cellular telephones, and evidence that tends to identify the person having dominion and control over the cellular telephone, such as electronic address books or contact lists on the phone, call logs, saved text messages, saved usernames and passwords and documents;

k.      Firearms, explosives, ammunitions, firearm components, firearm accessories, tactical equipment and other items pertaining to the domestic and international trafficking of firearms, including, but not limited to, handguns, pistols, revolvers, rifles, machine guns, and other weapons, and any records of receipts pertaining to firearms, parts, accessories and ammunition;

l.      Any and all tools reasonably believed to be possessed or used by subject of this investigation in furtherance of manufacturing or modifying firearms; including but not limited to drills, presses, jigs, and cutting tools;

16

m.     Books, records, receipts, bills of lading, notes, ledgers, papers, business records, packaging, and other items relating to the purchase, possession, receipt, transfer, manufacture or distribution of firearms, including, but not limited to, materials, chemicals, tools and literature related to firearms;

n.     Photographs, including still photographs, negatives, video recordings, slides, film, undeveloped film, digital photos and the contents therein, in particular, photographs of co-conspirators, or those relating to purchase, possession, receipt, transfer, manufacture or distribution of firearms;

o.      Contact information relating to suppliers, manufacturers and purchasers involved in the purchase, possession, receipt, transportation, transfer, manufacture or distribution of firearms;

p.     Correspondence pertaining to the purchase, possession, receipt, transfer, manufacture or distribution of firearms, whether transmitted or received using a computer, wireless telephone, a facility or means of interstate commerce, common carrier, or mail; and

q.     Safes or other locked containers and their contents to be searched for the listed items.

43.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to maintain in their residences records relating to their drug trafficking activities.  Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances.  Often drug traffickers keep ledgers or "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers.  Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking

business. I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.

44. Furthermore, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. Drug traffickers also often maintain one or more currency counting machines to aid in counting their drug proceeds. Many experienced drug traffickers will often engage in money laundering to conceal the source of their drug proceeds and will use proceeds to purchase legitimate investments or expensive jewelry and precious metals. In other instances, drug traffickers will combine cash from their drug trafficking with cash deposits from other legitimate business activities in an attempt to hide their illegal conduct. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences.

45. Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that drug traffickers generally try to hide cash and sensitive documents related to their drug trafficking and money laundering activities in safes, hidden compartments, or other containers so that other individuals who enter their residence do not discover these materials.

46. Many drug dealers receive their drugs through overnight parcels and keep mailing labels both used and unused in their residence for future use. Additionally, such drug traffickers often send the proceeds of their drug sales via overnight delivery, Western Union, and/or wire to their suppliers in order to pay for a continuing supply of drugs. Such individuals will often maintain records of these transactions for a period of time in case there is a later dispute concerning what funds were transmitted and when.

47.     Drug traffickers, even those who do not sell firearms, often possess firearms, ammunition, and other dangerous weapons to protect their proceeds, product, and person from others who might attempt to rob them, and to enforce payment from their customers. Drug traffickers do not typically call the police when they are robbed of their drugs or drug proceeds and they do not typically file lawsuits to recover unpaid drug debts. As a result, it is common for drug traffickers to arm themselves instead of calling the police or seeking legal recourse. Further, since drug trafficking activities are conducted over an extended period of time, drug traffickers possess firearms, ammunition, body armor, firearm cleaning kits, scopes, holsters and other dangerous weapons for extended periods of time in convenient and safe locations such as their residences, businesses, stash houses, on their persons and in their vehicles.

48.     Based on training and experience, I know that most drug dealers regularly use cellular telephones to communicate about their drug trafficking activities with customers, suppliers, and other coconspirators. As described above, the GYNAN used a cellular telephone to communicate with the CS to arrange drug and gun purchases and money payments. In my training and experience, I also am aware that drug traffickers are often aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and/or use multiple cellular phones at the same time, as well as prepaid cellular phones (where the subscriber of the phone is not required to provide personal identifying information), in an effort to thwart law enforcement's use of electronic surveillance. Because cellular telephones are often a principal means of communication, drug dealers typically keep the phones in close proximity or at their residences. Additionally, in my experience, many drug dealers do not dispose of their cellular telephones when getting a new number, but instead just discard them in various locations in their residences. As a result, it is common to recover not only paper records pertaining to the use of a

19

cellular phone by drug dealers, such as bills, call detail records, statements, and other documents, but the cellular telephones themselves, from drug dealers' residences.

49.     Seizure of devices containing this information will provide information relating to coconspirators and accomplices.  I know, based upon my training and experience, as well as consultation with other investigators, that individuals who sell illegal drugs typically use cellular telephones to communicate with their suppliers, their customers, and with other coconspirators, and that they communicate both via both voice calls and via email and/or text messaging.  I also know that persons who sell illegal drugs regularly keep records of their illegal activities.  These records can include, but are not limited to, contact list of buyers and sellers, ledgers of sales and money owed by customers or to suppliers, and lists of quantities and/or specific controlled substances preferred by or ordered by specific customers.  Individuals engaged in drug trafficking activities often take photographs of their closest confederates.   Records of drug trafficking activities can be produced and maintained on paper in a tangible form and/or by electronic means on a cellular telephone.  From my training and experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B on their cellular telephones.

50.     Additionally, I know that many drug traffickers often use cellular telephones in order to communicate quickly and economically with their suppliers and customers via the internet.  I am also aware that individuals frequently use cellular telephones to create and store records of their actions by communicating with others through e-mail, electronic messages, and updates to online social-networking websites; keeping their calendars; arranging for travel; storing pictures; researching topics related to drug trafficking; and accessing their bank, financial, investment, utility, and other accounts online.  Additionally, many cellular phones today have a

GPS navigation device on the phone. Examination of the GPS data on a cellular phone can provide valuable evidence as to the locations where drug traffickers meet with coconspirators, including their sources of supply, and can aid in identifying those individuals. Additionally, review of GPS data can aid in identifying offsite locations where drug traffickers store drugs, maintain bank accounts, and conceal their drug proceeds.

51.    Based upon my training and experience, and information provided to me by others involved in the forensic examination of computers, I know that electronic data on cellular telephones can be stored in a variety of methods, including, but not limited to, within the memory of the cellular telephone; within volatile memory, such as RAM; or on removable media, such as memory cards. I also know that electronic data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the internet. This is true because:

a.    Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

b.    Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.    Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

d.    Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser on a cellular

telephone often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

### Conclusion

52.    WHEREFORE, I submit that there is probable cause to believe that GYNAN has distributed and possessed with intent to distribute controlled substances, that is methamphetamine, in violation of Title 21, United States Code, Section 841, and that evidence of the Target Offenses, described more fully in Attachment B, will be found in Target Location 1, described more fully in Attachment A.

Respectfully submitted,

Galen Doud, Special Agent
Drug Enforcement Administration

Sworn via telephone in accordance with Fed R. Crim. P. 4.1 on January ____13____, 2025

Honorable Jennifer C. Boal
United States Magistrate Judge

## ATTACHMENT A – Premises to be Searched

**8 Rowell Court, Amesbury, Massachusetts** ("Target Location 1") is located in a blue sided, multi-unit structure located at the end of Rowell Court. When facing this residence from the street, Target Location 1 is the left-end unit. There is a glass storm door in front of a dark red colored front door. The number "8" is displayed on the left side of the front door. There is also a rear entrance to a back deck area. A photograph of the exterior of Target Location 1 is below. This photograph was taken in 2012, but based on recent video and physical surveillance of Target Location 1, this photo remains accurate.



**ATTACHMENT B**

All records and tangible objects in whatever form, from October, 2024 to present, that constitute evidence, fruits, or instrumentalities of violations of Distribution and Possession with Intent to Distribute Controlled Substances, that is Methamphetamine, in violation of Title 21, United States Code, Section 841; conspiracy to distribute and to possess with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 846; possession of a firearm in furtherance of drug trafficking, in violation of Title 18, United States Code, Section 924(c); felon in possession of a firearm, in violation of Title 18, United States Code, Section 922(g), and unlawful possession and transfer of a machinegun, in violation of Title 18, United States Code, Section 922(o).  (the "Target Offenses"):

1. Controlled substances, including but not limited to methamphetamine, crack cocaine, and materials used to "cut" or dilute those substances.

2. Books, records, receipts, notes, ledgers, and other papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers or relating to the purchase, storage, or distribution of controlled substances.  Such documents include, but are not limited to, photographs, telephone address books; planners; notes; ledgers; prescriptions; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

3. Cash, currency, and records relating to drug trafficking activity income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; monetary notes; registrations; purchase or sales invoices; and bank records.

4. Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

5. Surveillance cameras;

6. Cellular telephones used by GYNAN and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking located in the memory of any mobile telephone, including but not limited to:

   a. Names and contact information that have been programmed into the device(s) (including but not limited to contacts lists) of individuals who may be engaged in drug trafficking;

   b. Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

   c. Text messages both sent to and received by the device(s) (including any in draft form) relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking;

   d. Incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

   e. GPS data;

   f. Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

   g. Documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or individuals engaged in drug trafficking;

   h. All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

   i. Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.

7. Firearms, explosives, ammunitions, firearm components, firearm accessories, tactical equipment and other items pertaining to the domestic and international trafficking of firearms, including, but not limited to, handguns, pistols, revolvers, rifles, machine guns, and other weapons, and any records of receipts pertaining to firearms, parts, accessories and ammunition;

25

8. Any and all tools reasonably believed to be possessed or used by subject of this investigation in furtherance of manufacturing or modifying firearms; including but not limited to drills, presses, jigs, and cutting tools.

9. Books, records, receipts, bills of lading, notes, ledgers, papers, business records, packaging, and other items relating to the purchase, possession, receipt, transfer, manufacture or distribution of firearms, including, but not limited to, materials, chemicals, tools and literature related to firearms;

10. Photographs, including still photographs, negatives, video recordings, slides, film, undeveloped film, digital photos and the contents therein, in particular, photographs of co-conspirators, or those relating to purchase, possession, receipt, transfer, manufacture or distribution of firearms;

11. Contact information relating to suppliers, manufacturers and purchasers involved in the purchase, possession, receipt, transportation, transfer, manufacture or distribution of firearms;

12. Correspondence pertaining to the purchase, possession, receipt, transfer, manufacture or distribution of firearms, whether transmitted or received using a computer, wireless telephone, a facility or means of interstate commerce, common carrier, or mail; and

13. Safes or other locked containers and their contents to be searched for the listed items.